PRESENT: Lemons, C.J., Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Russell, S.J.

OLD DOMINION COMMITTEE FOR FAIR
UTILITY RATES

v. Record No. 161519

STATE CORPORATION COMMISSION, ET AL.

                                  OPINION BY
             JUSTICE ELIZABETH A. McCLANAHAN
VML/VACO APCO STEERING             September 14, 2017
COMMITTEE

v. Record No. 161520

STATE CORPORATION COMMISSION, ET AL.


KAREN E. TORRENT

v. Record No. 161521

STATE CORPORATION COMMISSION, ET AL.


FROM THE STATE CORPORATION COMMISSION

Appellants, Old Dominion Committee For Fair Utility Rates ("Old Dominion"),

VML/VACO APCO Steering Committee ("VML") and Karen E. Torrent ("Torrent"), challenge

in these consolidated appeals of right the decision of the State Corporation Commission

("Commission") upholding the constitutionality of Code § 56-585.1:1. This statute suspended

the Commission's biennial base rate reviews for Appalachian Power Company (APCO) and

Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("Dominion Power")

under Code § 56-585.1 until the years 2020 and 2021, respectively. In reaching its decision, the

Commission rejected appellants' argument that Code § 56-585.1:1 violates Article IX, § 2 of the

Constitution of Virginia. We agree with the Commission and affirm.

I.  BACKGROUND

A.  Overview of Electric Rates Regulation in Virginia

This constitutional challenge to Code § 56-585.1:1 arises in the context of the General Assembly's exercise of constitutional and legislative authority over the Commission's authority to regulate the rates electric utility companies charge their customers.

1.  Commission's Constitutional Ratemaking Authority

The Commission, while created under the 1902 Constitution of Virginia, was not given constitutional authority to regulate electric rates until the passage of the 1971 Constitution of Virginia, under Article IX, § 2, clause 3, which provides:  "*Subject to such criteria and other requirements as may be prescribed by law*, the Commission shall have power and be charged with the duty of regulating the rates . . . of . . . electric companies."  (Emphasis added.)  *See Commonwealth v. Virginia Electric & Power Co.* (*VEPCO*), 214 Va. 457, 463, 201 S.E.2d 771, 775 (1974); *see also Elizabeth River Crossings OpCo, LLC v. Meeks*, 286 Va. 286, 307-08, 749 S.E.2d 176, 186-87 (2013).  This is the Commission's sole source of constitutional ratemaking authority.

2.  Commission's Statutory Ratemaking Authority

Long before the Commission received the above-stated constitutional ratemaking authority, the General Assembly first conferred statutory authority upon the Commission to regulate the rates of electric companies in 1914.  *VEPCO*, 214 Va. at 463, 201 S.E.2d at 775. Until 1999, the General Assembly continued to prescribe the Commission's manner of determining such rates under Chapter 10, Article 2 of Title 56 (former Code § 56-234 *et seq*.) and its predecessor statutes.  *Appalachian Power Company v. State Corp. Comm'n*, 284 Va. 695, 699, 733 S.E.2d 250, 252 (2012).  "Under this regulatory regime, the rates could be changed

following a review initiated by the Commission or upon an application filed by an electric utility," and the Commission was given "broad discretion in selecting the methodology for determining rates." *Id*.

In 1999, approximately 28 years after the passage of Article IX, § 2, the General Assembly enacted the Virginia Electric Utility Restructuring Act (former Code § 56-576 *et seq*.), which deregulated parts of the electric utility industry and introduced competition among the providers of electric generation. 1999 Acts ch. 411; *see Appalachian Power Company*, 284 Va. at 699-70, 733 S.E.2-74d at 252; *Potomac Edison Co. v. State Corp. Comm'n*, 276 Va. 577, 580, 667 S.E.2d 772, 773 (2008). This legislation, as amended, established a transition period to a competitive market beginning in 2001 that "capped" base rates for electric utilities for seven years, during which the Commission had no authority to change base rates except in expressly limited circumstances. 1999 Acts ch. 411; 2004 Acts ch. 827; 2007 Acts chs. 888, 933; *see also Appalachian Power Company*, 284 Va. at 699-70, 733 S.E.2-74d at 252; *Potomac Edison Co.,* 276 Va. at 580-82, 667 S.E.2d at 773-75.

In 2007, the General Assembly ended the deregulation program effective December 2008, and enacted Code § 56-585.1, which established a new regulatory regime. 2007 Acts chs. 888, 933; *see Appalachian Power Company*, 284 Va. at 700, 733 S.E.2d at 252; *Potomac Edison Co.,* 276 Va. at 582 n.4, 667 S.E.2d at 774-75 n.4. Code § 56-585.1 "reaffirmed the Commission's authority to regulate electric utility rates but prescribed certain procedures and methodologies which the Commission must follow in establishing such rates." *Id.* Under the statute, the performance of electric utility companies is reviewed every two years. During this biennial review, "the Commission considers the company's rates, terms, and conditions for the provision of generation, distribution and transmission services for the preceding two years." *Id*.

3

(citing Code § 56-585.1(A)).  Furthermore, "[w]hile the biennial review has some characteristics of the Chapter 10 base rate proceeding, the statute imposes significant limitations on the Commission's discretion in adjusting rates." *Id.*  The central limitation is that the Commission may not order a base rate reduction unless it finds that the utility had excess earnings in two consecutive biennial reviews.  *Id.* at 700, 733 S.E.2d at 253 (citing Code § 56-585.1(A)(8)(iii) (now Code § 56-585.1(A)(8)(iii)).  Under this regulatory regime, the Commission reviewed and affirmed APCO's base rates in its 2014 biennial review.

Then in 2015, the General Assembly enacted Code § 56-585.1:1, which suspended APCO's biennial reviews until 2020 (to review 2018-2019) and prohibited the Commission from adjusting APCO's base rates for any part of this interim period (the "Transitional Rate Period"), except for possible temporary, emergency increases requested by APCO.[1]  2015 Acts ch. 6. Code § 56-585.1:1 thus effected a four-year base rate freeze for APCO.[2]

---

[1] Code § 56-585.1:1(A) provides, in relevant part:

> No biennial reviews of the rates, terms, and conditions for any service of a Phase I Utility, as defined in § 56-585.1 [i.e., APCO], shall be conducted at any time by the State Corporation Commission for the four successive 12-month test periods beginning January 1, 2014, and ending December 31, 2017. No biennial reviews of the rates, terms, and conditions for any service of a Phase II Utility, as defined in § 56-585.1 [i.e., Dominion Power], shall be conducted at any time by the State Corporation Commission for the five successive 12-month test periods beginning January 1, 2015, and ending December 31, 2019. Such test periods beginning January 1, 2014, and ending December 31, 2017, for a Phase I Utility, and beginning January 1, 2015, and ending December 31, 2019, for a Phase II Utility, are collectively referred to herein as the "Transitional Rate Period."

[2] For Dominion Power, Code § 56-585.1:1 effected a five-year base rate freeze, in suspending its biennial reviews until 2021.

B.  Old Dominion's Petition Challenging Code § 56-585.1:1

Old Dominion, an association of large industrial customers of APCO, filed a petition asking the Commission for: (a) a declaratory judgment that Code § 56-585.1:1 violates Article IX, § 2 of the Constitution of Virginia and, accordingly, that APCO is required under Code § 56-585.1 to make biennial review filings in 2016 and 2018; and (b) an order directing APCO to make such filings.

In the petition, Old Dominion asserted that even though the Commission's constitutional authority to regulate electric utility rates under Article IX, § 2 is expressly "[s]ubject to such criteria and other requirements as may be prescribed by law," this provision does not grant to the General Assembly the power to transfer the Commission's ratemaking authority to itself.  While giving the General Assembly "wide latitude to determine the standards that must be used by the Commission in regulating rates," according to Old Dominion, "the Constitution reserves for the Commission—and the Commission alone—the power to set electric utility rates."  (Citation and internal quotation marks in petition omitted.)  "By suspending biennial reviews and prohibiting the Commission from changing base rates (except at the utility's request, on a temporary basis, in emergencies)," Old Dominion argued, Code § 56-585.1:1 unconstitutionally "fixes the base rates that a utility will charge its customers for a period well into the future, and deprives the Commission of any power to reduce or otherwise regulate those rates."  In other words, "[i]t leaves the Commission utterly powerless to protect customers from unfair and unreasonable base rates, even when the rates are designed to provide significant excess revenues for the utility and its shareholders."  By doing so, the statute, in Old Dominion's view, unconstitutionally prohibits the Commission from discharging "its constitutional power and duty."

5

After Old Dominion filed the petition, VML, comprised of representatives of local governments and other political subdivisions in Virginia located within APCO's service area, and Torrent, a Virginia residential customer of Dominion Power proceeding pro se, among others, filed responses with the Commission in support of Old Dominion, making the same argument that Code § 56-585.1:1 is unconstitutional under Article IX, § 2.

The Attorney General of Virginia, APCO, and Dominion Power filed responses with the Commission opposing Old Dominion's petition, arguing that the statute is constitutional.[3] These respondents asserted that the plain language of Article IX, § 2 clearly and unambiguously subordinates the Commission's ratemaking authority to limitations established by the General Assembly. They argued that Code § 56-585.1:1 is, indeed, no different in effect than the limitations imposed upon the Commission's ratemaking authority under Code § 56-585.1's biannual regulatory regime—which Old Dominion was in fact seeking in its petition to enforce. They also pointed to other such legislation, emphasizing in particular the General Assembly's deregulation of certain electric utilities in 1999 that capped base rates for seven years. Furthermore, they asserted, this Court's decision in *VEPCO* controls. There, this Court held that the subject-to-such-requirements language in Article IX, § 2, clause 3, is "clear and unambiguous" in subordinating the authority of the Commission to regulate electric rates "to the power of the General Assembly to command otherwise." 214 Va. at 465, 201 S.E.2d at 777.

C.  Commission's Final Order

Concluding that Code § 56-585.1:1 is constitutional under Article IX, § 2, the Commission issued a final order denying Old Dominion's petition, to which Commissioner

---

[3] The Attorney General did so despite having opposed the passage of Code § 56-585.1:1 on policy grounds.

Dimitri dissented. The dissent discussed extensively what it views as the statute's negative public policy outcomes. The Commission rejected the public policy arguments against the statute made by Old Dominion, the dissent and others, as immaterial. The Commission focused instead on the purely legal issue of whether Old Dominion had carried its burden of overcoming the presumption in favor of the statute's constitutionality—which the Commission acknowledged is among the strongest presumptions in Virginia law. Thus, its "duty in this case," the Commission explained, "is to decide the legal question of constitutionality without regard to our public-policy preferences and not to conflate the two."[4]

The Commission reasoned that the temporary base rate freeze under Code § 56-585.1:1 on the base rates it had previously set for APCO and Dominion is "not unprecedented and must be considered in light of [this] Court's unequivocal instruction that any alleged unconstitutionality must be clear and palpable and that any reasonable doubt renders the statute constitutionally valid." As such, the Commission determined, this temporary rate base freeze "can reasonably be considered [as falling] within the 'criteria and other requirements'" that may be prescribed by the General Assembly under Article IX, § 2.

The Commission expressly rejected the theory implicit in the arguments made by Old Dominion, the dissent and other proponents of the petition challenging Code § 56-585.1:1 to the effect that Article IX, § 2 "grants to the Commission a plenary power to legislate that is both *exclusive of*, and *superior to*, that of the General Assembly. Under this theory, the General Assembly apparently can enact purely *procedural*, but *not substantive*, criteria and requirements, or it can enact some substantive criteria and requirements as long as they don't cross a line,

---

[4] Like the Attorney General, the Commission had opposed the passage of Code § 56-585.1:1 on policy grounds.

which is neither clearly located or defined." (Emphases in original.) In any event, while under this theory the General Assembly "can 'prescribe' how the Commission regulates rates," it "cannot 'remove' the rate-setting authority." Based on such a test, the Commission explained, numerous ratemaking related legislative enactments prior to Code § 56-585.1:1 would have been unconstitutional—with no limiting principle having been proposed. This would include the 1999 Virginia Electric Utility Restructuring Act's removal of the Commission's authority to set rates for electric utilities in favor of deregulation. That legislation would have been unconstitutional because "the General Assembly could never make the *public policy* decision to deregulate services of the types of companies listed in Article IX, § 2 [i.e., railroad, telephone, gas and electric companies] by removing the Commission's authority to set the rates for such services and thereby allowing prices to be set by the market." (Emphasis in original.)

Eschewing this interpretation of Article IX, § 2, the Commission concluded "[t]here is no historical evidence that those who adopted the 1971 Constitution intended such a grant of plenary policy-making power to the Commission," quoting as support for its conclusion *VEPCO*, 214 Va. at 465, 201 S.E.2d at 777 ("[T]he authority of the [Commission] . . . is *subordinate* to the power of the General Assembly to command otherwise."), and *Potomac Elec. Power Co. v. State Corp. Comm'n*, 221 Va. 632, 636, 272 S.E.2d 214, 216 (1980) ("The [Commission's] regulatory jurisdiction is *not* plenary."). (Emphasis in Commission's final order.)

The Commission also recognized that under the logic of Old Dominion's petition many of the provisions of Code § 56-585.1 governing biennial reviews—which the proponents of the petition ultimately seek to enforce—may be unconstitutional. Thus, the Commission deduced, the proponents "would have us return to ground that [their] own argument, if accepted, would render infirm," thereby undermining the logic of their challenge to Code § 56-585.1:1.

8

## II.  ANALYSIS

### A.  Standard of Review

The constitutionality of Code § 56-585.1:1 presents an issue of law subject to de novo review.  *Appalachian Power Company*, 284 Va. at 703, 733 S.E.2d at 254; *Appalachian Voices v. State Corp. Comm'n*, 277 Va. 509, 516, 675 S.E.2d 458, 461 (2009).  We are guided in this review by the fundamental principle that "all actions of the General Assembly are presumed to be constitutional."  *Montgomery Cty. v. Virginia Dept. of Rail & Public Trans*., 282 Va. 422, 435, 719 S.E.2d 294, 300 (2011) (quoting *Copeland v. Todd*, 282 Va. 183, 193, 715 S.E.2d 11, 16 (2011)).  Indeed, there is "no stronger presumption known to the law," *id*.  (collecting cases), and therefore "a heavy burden of proof is thrust upon the party" challenging a statute's constitutionality, *Harrison v. Day*, 200 Va. 764, 770, 107 S.E.2d 594, 598 (1959).

This strong presumption reflects the breadth of legislative power in Virginia.  "Unlike the Congress of the United States, the General Assembly of Virginia functions under no grant of power."  *Carter v. City of Norfolk*, 206 Va. 872, 874, 147 S.E.2d 139, 141 (1966).  The General Assembly, in "represent[ing] the sovereign authority of the people," is restricted only by the Constitution of Virginia "in express terms or by strong implication.  We look to the Constitution of the State not for grants of power, but for limitations. . . .  [I]t is a restraining instrument, and . . . the General Assembly of the State possesses all legislative power not prohibited by the Constitution."  *Gallagher v. Commonwealth*, 284 Va. 444, 452, 732 S.E.2d 22, 25-26 (2012) (quoting *Whitlock v. Hawkins*, 105 Va. 242, 248, 53 S.E. 401, 403 (1906)).  In short, "[u]nless forbidden by some State or Federal constitutional provision," the General Assembly's "powers are plenary."  *Harrison*, 200 Va. at 770, 107 S.E.2d at 598.

9

In deference to this broad legislative authority, we have repeatedly said that a statute will be upheld as constitutional unless it is "plainly repugnant" to some provision of the Virginia or Federal Constitutions. *Elizabeth River Crossings*, 286 Va. at 301, 749 S.E.2d at 183 (quoting *Jamerson v. Womack*, 244 Va. 506, 510, 423 S.E.2d 180, 182 (1992)); *see Montgomery Cty.*, 282 Va. at 435, 719 S.E.2d at 300; *Harrison*, 200 Va. at 770, 107 S.E.2d at 598; *Ex parte Settle*, 114 Va. 715, 719, 77 S.E. 496, 497 (1913). In other words, the unconstitutionality of a statute must be "clear and palpable." *Gallagher*, 284 Va. at 452, 732 S.E.2d at 26 (quoting *Whitlock*, 105 Va. at 248, 53 S.E. at 403). We are thus compelled to "resolve any reasonable doubt regarding a statute's constitutionality in favor of its validity." *Montgomery Cty.*, 282 Va. at 435, 719 S.E.2d at 300 (quoting *Supinger v. Stakes*, 255 Va. 198, 202, 495 S.E.2d 813, 815 (1998*); see Peery v. Virginia Bd. of Funeral Directors,* 203 Va. 161, 165, 123 S.E.2d 94, 97 (1961) ("To doubt is to affirm."); *Reynolds v. Milk Comm'n of Va.*, 163 Va. 957, 966, 179 S.E. 507, 510 (1935) (same); *Taylor v. Commonwealth*, 117 Va. 909, 914, 85 S.E. 499, 501 (1915) (same).

B. Code § 56-585.1:1 is constitutional under Article IX, § 2

Applying these principles, we agree with the Commission that Old Dominion, with its support from the other appellants, has not overcome the strong presumption that Code § 56-585.1:1 is constitutional under Article IX, § 2. To prevail, the appellants are required to show that Article IX, § 2 prohibits the General Assembly from suspending the Commission's biennial base rate reviews. The Commission's status as a creation of the Constitution of Virginia is not enough, as "[i]t is well established that the [Commission] 'has no inherent power simply because it was created by the Virginia Constitution.'" Elizabeth River Crossings, 286 Va. at 307, 749 S.E.2d 186 (quoting VYVX of Va., Inc. v. Cassell, 258 Va. 276, 290, 519 S.E.2d 124, 131 (1999)). There is nothing in Article IX, § 2 that clearly indicates that the Commission's

authority to set rates displaces or is exclusive of the General Assembly's authority. To the contrary, the prefatory phrase in Article IX, § 2, clause 3, plainly makes the Commission's authority to regulate rates "[s]ubject to such criteria and other requirements as may be prescribed by law."

In the context of the Commission's authority to regulate the rates that electric utility companies charge for services furnished to governmental entities, we concluded in *VEPCO* that the "clear and unambiguous meaning" of the disputed subject-to-such-requirements language is that such authority of the Commission is "subordinate to the power of the General Assembly to command otherwise."[5] 214 Va. at 465, 201 S.E.2d at 777. We there so construed this language in deciding the constitutionality of Code § 56-234, which provided that the electric rates charged to government entities shall not be regulated by the Commission. Concluding that the General Assembly could so "command" under the plain language of Article IX, § 2, clause 3, we upheld the constitutionality of the statute. *Id.* In doing so, we rejected the argument that "the disputed language simply means that the General Assembly has the right to prescribe a manual of procedure for the [Commission] and not to grant legislative power to *curtail or eliminate* the [Commission's] power and duty with regard to . . . particular classes of rates charged by electric utilities." *Id.* at 464, 201 S.E.2d at 776 (internal quotation marks omitted) (emphasis added). Article IX, § 2, we determined, does indeed grant to the General Assembly such broad legislative power over the Commission's authority to regulate the rates charged by electric utility companies. *Id.* at 464-66, 201 S.E.2d at 776-77. We thus found "no conflict" in the constitutional authority of the Commission to regulate electric rates and the General Assembly's

---

[5] That is to say, we so construed the disputed language without the "need [to] resort to extrinsic evidence in the form of legislative debate or contemporaneous construction to supply the meaning." *VEPCO*, 214 Va. at 464, 201 S.E.2d at 776.

11

legislative enactment to eliminate that authority in the case of rates charged to governmental entities—given the General Assembly's ultimate authority under Article IX, § 2. *Id*. at 466, 201 S.E.2d at 777.

In light of this authority of the General Assembly, we have repeatedly stated in other cases since the passage of the 1971 Constitution of Virginia that the Commission's authority to regulate the rates of electric utility companies has been "delegated" to it by the General Assembly under various legislative enactments. See *Virginia Elec. & Power Co. v. State Corp. Comm'n*, 284 Va. 726, 741, 735 S.E.2d 684, 691 (2012) ("[W]hen the Commission is conducting a ratemaking procedure, it is exercising a legislative function delegated to it by the General Assembly."); *Potomac Edison Co*., 276 Va. at 587, 667 S.E.2d at 777 ("[Allegheny Power] was asking the Commission to exercise its ratemaking authority, a legislative function delegated to the Commission by the General Assembly."); *Commonwealth ex rel. Div. of Consumer Counsel v. Potomac Edison Co*., 233 Va. 165, 170-71, 353 S.E.2d 785, 788 (1987) ("The Commission is an expert tribunal which exercises a legislative function in fixing rates, under powers delegated to it by the General Assembly." (quoting *Old Dominion Power, Co. v. State Corp. Comm'n*, 228 Va. 528, 532, 323 S.E.2d 123, 125 (1984))); *Appalachian Power Co. v. Commonwealth*, 216 Va. 617, 625-26, 221 S.E.2d 872, 878 (1976) ("[I]n performing the duty of fixing reasonable and just rates for a public service corporation providing heat, light and power service, the Commission exercises a legislative function delegated to it by the General Assembly by Code § 56-235, under Art. IX, § 2 of the Constitution of Virginia.").

Appellants, however, now seek to re-plow the same ground covered in *VEPCO* by arguing that the terms "criteria" and "requirements" in Article IX, § 2, clause 3, mean essentially the same thing, which is to limit the General Assembly's power to setting procedural standards

12

or rules that the Commission must use in exercising its ratemaking authority. But as we

explained in *VEPCO*, the "ready and complete answer" dispelling this argument is found in

Article IX, § 3 of the Constitution of Virginia, providing that "[t]he Commission may prescribe

its own rules of practice and procedure not inconsistent with those made by the General

Assembly. The General Assembly shall have the power to adopt such rules, to amend, modify,

or set aside the Commission's rules, or to substitute rules of its own."

> This paragraph from § 3, dealing specifically with the subject of rules of practice and procedure, vests in the General Assembly full and complete power to prescribe such rules or to alter or repeal those which may be promulgated by the [Commission]. It is difficult to believe that the General Assembly, in approving this paragraph for submission to the electorate while at the same time adding the [disputed] language to § 2, intended only to accomplish a single end in both instances—the reservation of the right to prescribe rules of procedure. If the language in § 2, "[s]ubject to such criteria and other requirements as may be prescribed by law," means only that the General Assembly may prescribe rules of procedure, then most of the quoted paragraph of § 3 would be completely superfluous, and that cannot be.

*VEPCO*, 214 Va. at 464-65, 201 S.E.2d at 776.[6] Indeed, the definition of the term

"requirements" in Article IX, § 2, clause 3, embraces more than mere procedure; it is

"[s]omething that must be done because of a law or rule; something legally imposed, called for,

or demanded; an imperative command." Black's Law Dictionary 1498 (10th ed. 2014). A law

suspending the Commission's biennial reviews thus fits comfortably among such "requirements

as may be prescribed by law." Va. Const. art. IX, § 2.

---

[6] In reference to the addition of the disputed prefatory phrase in Article IX, § 2, clause 3, "[s]ubject to such criteria and other requirements as required by law," this language was not included by the Commission on Constitutional Revision in the proposed draft of Article IX in what became the 1971 Constitution of Virginia. The language was instead added by the General Assembly when it approved the proposed constitution prior to its submission to the electorate. *VEPCO*, 214 Va. at 463-64, 201 S.E.2d at 775-76.

The Commission therefore correctly decided that Code § 56-585.1:1 is constitutional because it is not plainly repugnant to Article IX, § 2. We accordingly reject appellants' argument that Article IX, § 2 alters the General Assembly's plenary power to set public policy relative to the regulation of rates of electric utility companies, as it did here in suspending the Commission's biennial base rate reviews of APCO for two cycles with the enactment of Code § 56-585.1:1. In this regard, we recognize that this Court has "no constitutional authority to judge whether a statute is unwise, improper, or inequitable because the legislature, not the judiciary, is the sole author of public policy." *Tvardek v. Powhatan Village Homeowners Ass'n*, 291 Va. 269, 279-80, 784 S.E.2d 280, 285 (2016) (citations and internal quotation marks omitted). Furthermore, we reject appellants' argument that our construction of Article IX, § 2 lacks any limiting principle on the power of the General Assembly as relates to setting electric utility rates. The limiting principle in this instance, enshrined in our constitution, is the democratic process to which we certainly must also defer.

## III. CONCLUSION

For the foregoing reasons, we affirm the Commission's order dismissing Old Dominion's petition challenging the constitutionality of Code § 56-585.1:1.

*Affirmed.*

JUSTICE MIMS, dissenting.

"Subject to such criteria and other requirements as may be prescribed by law, the [State Corporation] Commission shall have the power and be charged with the duty of regulating the rates, charges, and services and, except as may be otherwise authorized by the Constitution or by

14

general law, the facilities of railroad, telephone, gas, and electric companies." Va. Const. art. IX, § 2.

This case boils down to a simple question: what does that sentence mean? The majority holds that it means the General Assembly may suspend the Commission's power and duty to set rates for electric companies. I disagree. I reject the premise that the rate-making authority granted to the Commission by the Constitution is subordinate to the General Assembly. Article IX, § 2 allows the legislature to control the general aspects of rate-making by establishing, by statute, standards and prerequisites for the Commission's exercise of its constitutional power. Article IX, § 2 does not empower the General Assembly to suspend the Commission's constitutionally-conferred rate-making authority. I therefore must respectfully dissent.

### A. THE CASE ON WHICH THE MAJORITY PRINCIPALLY RELIES WAS WRONGLY DECIDED AND SHOULD BE OVERRULED, STARE DECISIS NOTWITHSTANDING

### 1. THE COURT INCORRECTLY CONSTRUED ARTICLE IX, § 2 IN 1974

The majority principally relies on our precedent in *Commonwealth v. Virginia Electric & Power Co.* (*VEPCO 1974*), 214 Va. 457, 201 S.E.2d 771 (1974). In that case, VEPCO filed an application for a declaratory judgment that the Commission was empowered to regulate retail rates for services provided to government entities. *Id.* at 459, 201 S.E.2d at 772-73. Among the questions raised was whether Article IX, § 2 of the Constitution of Virginia of 1971 prohibited the General Assembly from interfering with the Commission's power and duty to set electric rates. *Id.* at 464, 201 S.E.2d at 776. The Court held that it did not for two reasons.

First, the Court rejected VEPCO's assertion that the clause "[s]ubject to such criteria and other requirements as prescribed by law" merely reserved to the General Assembly the power to prescribe procedural rules for the Commission. The Court noted that Article IX, § 3 expressly

15

provided that "[t]he Commission may prescribe its own rules of practice and procedure not inconsistent with those made by the General Assembly. The General Assembly shall have the power to adopt such rules, to amend, modify, or set aside the Commission's rules, or to substitute rules of its own." The Court held that if the "subject to" clause from Article IX, § 2 meant only that the General Assembly could prescribe procedural rules for the Commission, as VEPCO argued, the "subject to" clause and the "rules of practice and procedure" sentences in Article IX, § 3 would be redundant, and such an interpretation is impermissible. *Id.* at 464-65, 201 S.E.2d at 776.

Second, it rejected VEPCO's assertion that Article IX, § 2 allowed the General Assembly to overrule the Commission when it came to the regulation of railroad, telephone, gas, and electric *facilities*, but not when it came to regulating their rates, charges, and services.[1] Regarding the Commission's regulation of rates, charges, and services, VEPCO argued, the Constitution permitted the General Assembly only to dictate "the method" by which the Commission acted. The Court disagreed and held that what VEPCO described as "'the method'" was fully encompassed by the words "[s]ubject to such criteria . . . as may be prescribed by law," which, again, would impermissibly make the words "and other requirements" redundant. *Id.* at 465, 201 S.E.2d at 776-77.

The Court's conclusion in *VEPCO 1974* that "the authority of the [Commission] to regulate the rates charged by electric companies . . . is subordinate to the power of the General Assembly to command otherwise," *id.* at 465, 201 S.E.2d at 777, is the foundation for the

---

[1] VEPCO argued that the words "except as may be otherwise authorized by the Constitution or by general law, the facilities of railroad, telephone, gas, and electric companies" expressly permitted the General Assembly to supersede the Commission's authority to regulate facilities by statute, so the "subject to" clause at the beginning of the sentence could not have the same effect on the Commission's authority to regulate "rates, charges, and services."

16

majority's holding today that Code § 56-585.1:1 does not contravene Article IX, § 2. The majority's position is certainly reasonable: *VEPCO 1974* is long-established precedent. Nevertheless, I believe it was wrongly decided. Upon careful consideration, I conclude that VEPCO was correct in 1974 when it asserted that the Commission's constitutional authority to set electric rates could not be superseded by statute. Because the Court's error is one of constitutional interpretation, stare decisis must yield to a detailed re-examination.

The principal defect in the *VEPCO 1974* decision is its selective view of which provisions would be impermissibly made redundant. For example, by choosing to reject VEPCO's second argument because it would (in the Court's view) give the words "criteria" and "requirements" the same meaning and thereby impermissibly make them redundant, the Court ruled that "any difference between [the 'subject to' clause and the 'except as' clauses] becomes insubstantial." *Id.* at 465, 201 S.E.2d 776. In other words, the Court adopted the position that the "subject to" and "except as" clauses had the same meaning—and therefore were redundant— but that the words "criteria" and "requirements" could not have the same meaning because they would then be impermissibly made redundant. This interpretation is indefensible.

"It is a general rule that the words of a Constitution are to be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise." *Howell v. McAuliffe*, 292 Va. 320, 368, 788 S.E.2d 706, 734 (2016) (internal quotation marks omitted), *cert. denied sub nom. Manship v. McAuliffe*, 137 S.Ct. 657 (2017). "In interpreting [constitutional] text, we are guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning. Normal meaning may of course include an

idiomatic meaning, but it excludes secret or technical meanings . . . ." *District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008) (internal quotation marks, citations, and alteration omitted).

"Criterion" means "a standard on which a decision or judgment is based." Webster's Third New International Dictionary 538 (1993). "Requirement" means "a requisite or essential condition." *Id.* at 1929. The definitions themselves are sufficient to show that the two words are not the same, and therefore are not redundant. However, that conclusion sheds little light on what they mean. "Words, like syllables, acquire meaning not in isolation but within their context. [Someone] looking up the separate word 'foreign' in a dictionary might . . . interpret the phrase 'I have a foreign object in my eye' as referring, perhaps, to something from Italy." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 319 (1988) (Scalia, J., concurring in part and dissenting in part).

Read in context within Article IX, § 2's "subject to" clause, the meaning of "such criteria and other requirements" is unambiguous: it means the standards the Commission must consider while setting a rate and the prerequisites the Commission must fulfill before it does so. *See* Webster's Third New International Dictionary, *supra*, at 1791 (defining "prerequisite" as "something that is required"—i.e., a requirement—"beforehand"). These are two separate concepts: what must the Commission consider when deciding, and what must the Commission do before it decides.[2]

_____

[2] The majority's conclusion that "[a] law suspending the Commission's" rate-making process "fits comfortably" within the definition of "requirement," *supra* at 13, is unclear to me. Even accepting the majority's alternative definition of "requirement," Code § 56-585.1:1 does not impose some condition that the Commission must fulfill before it sets rates. There is no requirement or prerequisite that the Commission may satisfy in order to proceed to setting rates. To the contrary, the statute simply prohibits the Commission from setting rates, regardless of what it does first.

18

The "subject to" clause means that the General Assembly may impose standards and prerequisites that the Commission must adhere to when exercising its power and duty to set rates. It does not mean that the General Assembly may suspend that power and duty. By contrast, the "except as" clause (which is also unambiguous) *does* permit the General Assembly to eliminate or reassign the Commission's power and duty to regulate *facilities*. Read in context, the meaning of the two clauses is clear. First, "[s]ubject to such [standards] and other [prerequisites] as may be prescribed by law, the Commission shall have the power and be charged with the duty of regulating the rates, charges, and services . . . of railroad, telephone, gas, and electric companies." Second, "the Commission shall have the power and be charged with the duty of regulating" "the facilities of railroad, telephone, gas, and electric companies," "except as may be otherwise authorized by this Constitution or by general law." Because these two clauses have different meanings and effects, they cannot be redundant. The Court therefore erred in *VEPCO 1974* by giving them the same meaning. It was incorrect in light of both the plain meaning of the words used and the structure of the sentence. Making them redundant is also impermissible.

Similarly, the "subject to" clause in Article IX, § 2 has a different meaning and effect from the "rules of practice and procedure" sentences in Article IX, § 3. "Such criteria and other requirements" are not the same as "rules of practice and procedure." "Criteria and other requirements" to engage in rate-making are obligations *the Commission* must satisfy; "rules of practice and procedure" include obligations *those appearing before the Commission* must satisfy.[3]

---

[3] This interpretation shows that VEPCO was incorrect to argue that the "subject to" clause merely empowered the General Assembly to establish rules of practice and procedure. However, it also illustrates that the Court went too far in rejecting VEPCO's mistaken interpretation. There is a middle ground between VEPCO's interpretation of the clause and

This substantive difference between Article IX, §§ 2 and 3 is illustrated by comparing the actual requirements set out in § 156(b) of the Constitution of 1902 and the Commission's current rules of practice and procedure. The former provided that

> [b]efore the commission shall prescribe or fix any rate, charge, or classification of traffic, and before it shall make any order, rule, regulation or requirement directed against any one or more companies by name, the company or companies to be affected by such rate, charge, classification, order, rule, regulation or requirement, shall first be given, by the commission, at least ten days' notice of the time and place, when and where the contemplated action in the premises will be considered and disposed of, and shall be afforded, a reasonable opportunity to introduce evidence and to be heard thereon, to the end that justice may be done, and shall have process to enforce the attendance of witnesses . . . .

Constitution of Virginia § 156(b) (1902).[4] This requirement has now been reduced to an obligation to provide "reasonable notice of the time and place at which [a party] shall be afforded an opportunity to introduce evidence and be heard." Va. Const. art. IX, § 3. It is certainly within the General Assembly's Article IX, § 2 power to require by statute that such "reasonable notice" consist of at least ten days' notice, as the former constitution did.

By contrast, the Commission's rules of practice and procedure require, for example, that "[e]ach document must be filed on standard size white opaque paper, 8-1/2 by 11 inches in dimension, must be capable of being reproduced in copies of archival quality, and only one side of the paper may be used. Submissions filed electronically shall be made in portable document format (PDF)." 5 VAC § 5-20-150. This obligation is imposed on those who file documents with the Commission, not on the Commission itself. Thus, while "rules of practice and procedure" may also include "criteria and other requirements," the former address more subjects

_____

interpreting it to mean that the Commission's rate-making authority is wholly subordinate to the General Assembly, as the Court ruled.

[4] This provision does not create "criteria," but it does impose a "requirement," further illustrating the difference between the two.

20

and in greater detail than the latter, and they operate on different objects. Thus, because the "subject to" clause in Article IX, § 2 does not have the same meaning as the "rules of practice and procedure" sentences in Article IX, § 3 when examined in context, they cannot be impermissibly made redundant.

Consequently, *VEPCO 1974* was wrongly decided because both pillars of its rationale are flawed. The "subject to" clause has a clear, unambiguous meaning that does not duplicate either the "except as" clause that follows it or the "rules of practice and procedure" sentences in Article IX, § 3. *VEPCO 1974*'s interpretation of Article IX, § 2 therefore should be overruled.

## 2. PRECEDENT MUST NOT BE OVERRULED LIGHTLY, BUT IT MUST GIVE WAY WHEN IT IS IN ERROR

I "recognize the importance of the doctrine of stare decisis in our jurisprudence," *Nunnally v. Artis*, 254 Va. 247, 252, 492 S.E.2d 126, 128 (1997), but it "is only an adjunct of our duty as judges to decide by our best lights what the Constitution means. It is not an inexorable command." *McDonald v. City of Chicago*, 561 U.S. 742, 812 (2010) (Thomas, J., concurring in part and dissenting in part) (internal quotation marks and citation omitted). "Our strong adherence to [it] does not . . . compel us to perpetuate what we believe to be an incorrect application of the law." *Nunnally*, 254 Va. at 253, 492 S.E.2d at 129. In the words of our senior colleague, "[t]here is no reason why an error, once committed, should be enshrined forever, to the detriment of future generations, like Sir Francis Bacon's proverbial fly in amber." *Homeowners Warehouse, Inc. v. Rawlins*, 409 S.E.2d 115, 117 (1991) (Russell, J., dissenting.) "Indeed, this Court's obligation to reexamine critically its precedent will enhance confidence in the judiciary and strengthen the importance of stare decisis in our jurisprudence. Although we have only done so on rare occasions, we have not hesitated to reexamine our precedent in proper

cases and overrule such precedent when warranted." *Nunnally*, 254 Va. at 253, 492 S.E.2d at 128.

I believe that *VEPCO 1974* is such a case.

### B. THE COMMISSION EXERCISES A LEGISLATIVE FUNCTION WHEN SETTING RATES, BUT ITS POWER TO DO SO IS NO LONGER DELEGATED BY THE GENERAL ASSEMBLY

The majority quotes five cases for the proposition that when setting rates, the Commission exercises a legislative power delegated to it by the General Assembly. Although each case was decided after 1971, they all trace their origins to 1955. After the adoption of the Constitution of 1971, the proposition must be re-examined. I believe that such re-examination reveals that the proposition is no longer valid.

The five cases are *Virginia Electric & Power Co. v. State Corporation Commission* (*VEPCO 2012*), 284 Va. 726, 741, 735 S.E.2d 684, 691 (2012); *Potomac Edison Co. v. State Corporation Commission* (*Potomac Edison II*), 276 Va. 577, 587, 667 S.E.2d 772, 777 (2008); *Commonwealth ex rel. Division of Consumer Counsel v. Potomac Edison Co.* (*Potomac Edison I*), 233 Va. 165, 170-71, 353 S.E.2d 785, 788 (1987); *Old Dominion Power Co. v. State Corporation Commission*, 228 Va. 528, 532, 323 S.E.2d 123, 125 (1984); and *Appalachian Power Co. v. Commonwealth*, 216 Va. 617, 626, 221 S.E.2d 872, 878 (1976). *VEPCO 2012* cites *Potomac Edison II*. That case in turn cites *Potomac Edison I*, *Old Dominion*, and *Central Telephone Co. v. State Corporation Commission*, 219 Va. 863, 874, 252 S.E.2d 575, 581 (1979).[5] *Potomac Edison I* simply quotes *Old Dominion*. *Old Dominion* cites *Central*

---

[5] *Potomac Edison II* also cites *Hopewell Cogeneration Ltd. Partnership v. State Corporation Commission*, 249 Va. 107, 115, 453 S.E.2d 277, 281-82 (1995), but this case states only that rate-making is a legislative function, not that the General Assembly delegated power to the Commission.

*Telephone*.  That case cites *Appalachian Power* and *Board of Supervisors of Arlington County v. Virginia Electric & Power Co.* (*VEPCO 1955*), 196 Va. 1102, 1109, 87 S.E.2d 139, 144 (1955).[6] *Appalachian Power* also cites *VEPCO 1955*.



Consequently, despite the number of cases the majority cites, they all depend on a single statement that predates the Constitution of 1971.  It is true that *Potomac Edison II*, 276 Va. at 587, 667 S.E.2d at 777, *Central Telephone*, 219 Va. at 874, 252 S.E.2d at 582, and *Appalachian Power*, 216 Va. at 626, 221 S.E.2d at 878 each cite Article IX, § 2 alongside the cases identified above, but none of them explain how that *constitutional* provision can possibly represent a delegation of power by the *General Assembly*, rather than by the *people of Virginia* who adopted it.

---

[6] *Central Telephone Co.* also cites *Howell v. Chesapeake & Potomac Telephone Co.*, 215 Va. 549, 557, 211 S.E.2d 265, 270 (1975), *Commonwealth v. Portsmouth Gas Co.*, 213 Va. 239, 241, 191 S.E.2d 220, 222 (1975), and *City of Lynchburg v. Chesapeake & Potomac Telephone Co.*, 200 Va. 706, 712, 107 S.E.2d 462, 467 (1959), but these cases, like *Hopewell Cogeneration*, state only that rate-making is a legislative function, not that the General Assembly delegated power to the Commission.

To the contrary, in *Howell*, in 1975, the Court stated that when it undertakes the legislative function of rate-making, "the Commission is the legislative branch of government" and that it "enjoys the full legislative power of the State." 215 Va. at 557, 211 S.E.2d at 270. It cited for these statements *City of Norfolk v. Chesapeake and Potomac Telephone Co.* (*C&P*), 192 Va. 292, 300, 64 S.E.2d 772, 776 (1951). In *C&P*, the Court quoted *Norfolk & Western Railway Co. v. Commonwealth*, 162 Va. 314, 322, 174 S.E. 85, 88 (1934), which held that "[i]n proceedings relating to the establishment of rates and charges for transportation and transmission companies," the Commission "is *the* legislative branch of the government." (Emphasis in original.)

Obviously, *C&P* and *Norfolk & Western* predate the Constitution of 1971. However, they involve a telephone company, which is a transmission company within the definition supplied by § 153 of the Constitution of 1902, and a railway company, which is a transportation company within the definition supplied by the same section. Therefore, in both cases, the Commission's rate-making authority was conferred directly by the Constitution of 1902 through § 156(b). It was not contingent on a delegation or grant of authority from the legislature to set rates for other utilities by statute under § 156(c), unlike *VEPCO 1955*, which involved an electric company. The contrast between the two sets of cases is stark: where the Commission acted under § 156(b), it was "*the* legislative branch," *Norfolk & Western*, 162 Va. at 322, 174 S.E. at 88; where it acted under § 156(c), it acted under authority delegated by the General Assembly, *VEPCO 1955*, 196 Va. at 1109, 87 S.E.2d at144.

This historical context is not mere digression. The Commission on Constitutional Revision ("the CCR") affirmatively acted in 1969 to draft a constitution that elevated the Commission's authority over electric rates from a power merely delegated by the General

24

Assembly to one with a direct constitutional foundation (like the Commission's authority over telephone and railway rates under the Constitution of 1902). It noted that the Commission lacked direct constitutional authority to set the rates of "companies furnishing gas and electricity, two of the most vital services provided to citizens of Virginia." Report of the Commission on Constitutional Revision 285 (1969). It proposed that the Commission "be given exclusive and paramount jurisdiction to regulate the rates, charges, and services of" such companies, just as it had existing authority over railroad and telephone companies. *Id.* Article IX, § 2 unquestionably places electric rates on equal footing with railroad and telephone rates. Consequently, whatever rate-making power the Commission has derives directly from the people, who adopted the Constitution of 1971, and cannot be only "delegated by the General Assembly." Therein lies the error in relying on a case that predates the Constitution of 1971 without examining its foundation.

The majority notes that the General Assembly altered the CCR's draft by adding the "subject to" clause to Article IX, § 2. Relying on *VEPCO 1974*, it holds that this clause subordinates the Commission's rate-making authority to the General Assembly. But reflect for a moment on the implication of that holding. It means that rather than *elevating* the Commission's authority over electric rates to a direct constitutional foundation equal to that it already had over railroad and telephone rates under § 156(b) of the Constitution of 1902, the Constitution of 1971 instead *diminished* the Commission's authority over railroad and telephone rates to a mere statutory foundation like that it had over electric rates under § 156(c) of the Constitution of 1902. In other words, the majority's holding turns Article IX, § 2 upside-down, allowing the Commission to set railroad and telephone rates only with the legislature's indulgence, in effect

25

eliminating the Commission's independence as the "additional" branch of government recognized in *C&P* and *Norfolk & Western*.

Surely, if that seismic result had truly been the intention of the General Assembly when it appended the "subject to" clause to the CCR's draft of Article IX, § 2, there would be *some* mention of it in the record of its proceedings and debates. Yet the only mention of the clause or reason for adding it to the draft was made by Senator Edward L. Breeden, Jr., of Norfolk, chairman of the Committee on Insurance and Banking that proposed the amendment. He said that the intention was "to give legislative control over the *general aspects* of rate-making." Proceedings and Debates for the Senate of Virginia Pertaining to the Amendment of the Constitution 269 (Extra Session 1969, Regular Session 1970) (emphasis added). This slender reed will not bear the weight.[7] Nothing—not the language in the CCR's report, the language on the floor, or the language in Article IX, § 2 as adopted by the people—supports the dramatic result to which the majority's holding inexorably leads: that the General Assembly intended to *weaken* the Commission's longstanding, pre-existing power over railroad and telephone rates rather than *strengthen* its power over electric rates.

I agree with the majority that the Commission has no authority to act simply because it is mentioned in the Constitution. To the contrary, as the Court stated in *Elizabeth River Crossings OpCo, LLC v. Meeks*, 286 Va. 286, 307, 749 S.E.2d 176, 186 (2013) (internal quotation marks omitted), "its jurisdiction must be found either in constitutional grants or in statutes which do not contravene that document." But Article IX, § 2 does more than merely mention or create the

---

[7] To the contrary, the "general aspects of rate-making" are consistent with the meanings of "criteria" and "requirements" in context that I describe above. They include the General Assembly's power to establish standards and prerequisites. They do not include empowering the General Assembly to suspend the Commission's authority to set rates altogether.

Commission; it vests the Commission with power to set rates.  The General Assembly need do nothing for the Commission to exercise this power, granted by the people.  Consequently, it is not "delegated by the General Assembly."

### C.  IF THE GENERAL ASSEMBLY CAN SUSPEND THE COMMISSION'S RATE-MAKING POWERS FOR A PERIOD OF YEARS, IT CAN SUSPEND THEM FOREVER

If it is true, as the majority holds, that the Commission's rate-making authority is "subordinate to the power of the General Assembly," *supra* at 11 (quoting *VEPCO 1974*, 214 Va. at 465, 201 S.E.2d at 777), then the General Assembly has the power to permanently divest the Commission of that power at will.  That sobering outcome thwarts the purpose behind creating the Commission in the first place.

As the Court acknowledged in 1920, before the Constitution of 1902 created the Commission "the State, through the legislature, certainly had plenary power over the rates of all public service corporations, but the power had never been exercised.  The avowed purpose of the convention, known to all, was to exercise the dormant power of the State for the control of such corporations.  It provided for the organization of the commission, and made it the governmental department of the State for the exercise of such powers." *City of Richmond v. Chesapeake & Potomac Telephone Co.*, 127 Va. 612, 622, 105 S.E. 127, 130 (1920).

The appellants raise the specter of the General Assembly choosing to set rates itself.  At oral argument, the Commonwealth repeatedly avoided the issue of whether the asserted "subordination" of the Commission to the General Assembly allowed the legislature to do so.  It reiterated that its position was solely that Code § 56-585.1:1 merely froze the existing rates set by the Commission, in effect suspending the Commission's rate-making power.  But if Article IX, § 2 confers on the General Assembly the power to suspend the Commission's authority, there

27

is no limit to the duration for which such a suspension may last. Thus, this interpretation restores the precise evil that led the people to create the Commission in 1902; they did so to ensure that *someone* was exercising the power to set the rates of public service corporations. The conclusion that the General Assembly has the power to suspend the Commission's authority indefinitely, which follows inexorably from the majority's opinion, would thwart that will.

The Commonwealth responded at oral argument that if some limiting principle were required to prevent the General Assembly from suspending the Commission's authority for too long, democracy was the limiting principle—i.e., that the voters would reprimand the legislature. The majority adopts this aphorism as its answer, too. Together, they seem to envision that after some period of sufficient duration, a majority of voters in a majority of the districts will revolt, uniting under the banner that the Commission's authority must be restored, and secure a bicameral legislative majority to compel that outcome. Despite having been previously elected to legislative office, I cannot begin to speculate how many years would have to pass before the esoteric issue of the Commission's constitutional authority to set rates rose to predominate over other public policy issues.

But more to the point, the people already have endured a period of legislative inaction in the field of rate-making. They spoke clearly against it when they created the Commission in 1902. They granted the Commission rate-making authority over railroads and telephone companies then, and expanded that power to include electric companies in 1971. Nothing in the text or history of Article IX, § 2 counsels otherwise.

### D. CONCLUSION

For these reasons, I reject the conclusion that the Commission's rate-making authority is subordinate to the General Assembly. The clear and unambiguous language of Article IX, § 2

allows the legislature to control the general aspects of rate-making by establishing, by statute, standards and prerequisites for the Commission's exercise of its constitutional power. Article IX, § 2 does not empower the General Assembly to suspend the Commission's rate-making authority, whether for one year or forever. I therefore respectfully dissent from the majority's holding to the contrary.